### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**CHARLES P. TOLEDANO, JR.**                    **CIVIL ACTION**

**VERSUS**                                      **NO. 15-6278-CJB-SS**

**CAROLYN COLVIN, ACTING**
**COMMISSIONER OF SOCIAL SECURITY**

### REPORT AND RECOMMENDATION

The plaintiff, Charles P. Toledano ("Toledano"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for disability insurance benefits and a period of disability under Title II of the Act, 42 U.S.C. § 423.

### PROCEDURAL HISTORY

On October 10, 2013, Toledano submitted an application for benefits alleging that he became disabled on December 1, 2011.  R. 116-117.  He identified his disabling conditions as: right shoulder surgery; severe degenerative arthritis in lower back and spinal cord; and depression and anxiety.  R.134.  On October 9, 2013, the Commissioner denied his claim for benefits.  R. 52-55.  There was a hearing before an Administrative Law Judge ("ALJ") on April 15, 2014.  Toledano was represented by counsel at the hearing.  R. 28.  On July 3, 2014, the ALJ issued an unfavorable decision.  R. 14-23.  On September 28, 2015, the Appeals Council denied the request for review.  R. 1-6.

On November 24, 2015, Toledano filed a complaint in federal court for review of the Commissioner's decision.  Rec. doc. 1.  Toledano was granted leave to proceed *in forma pauperis*.  Rec. doc. 5.  The parties filed cross-motions for summary judgment.  Rec. docs. 15 and 18.  Toledano is represented by counsel.

## STATEMENT OF ISSUES ON APPEAL

Issue No. 1.    Is there substantial evidence to support the ALJ's finding that Toledano was capable of the full range of light work.

Issue No. 2.    Did the ALJ err in failing to ask questions of a vocational expert who was present at the hearing?

Issue No. 3.    Did the ALJ give proper weight to the finding of the Functional Capacity Evaluation performed by Jones Physical Therapy?

Issue No. 4.    Did the ALJ fail to consider and list the six specific considerations required before deciding not to give controlling weight to the opinion of a treating physician?

Issue No. 5.    Did the ALJ err in failing to award benefits for a closed period from December 1, 2011 to May 20, 2013?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1.    Toledano met the insured status requirements of the Act through December 31, 2016.

2.    Toledano has not engaged in substantial gainful activity since December 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*)

3.    Toledano has the following severe impairments:  degenerative disc disease and degenerative joint disease (right shoulder) (20 CFR 401.1520(c)).

4.    Toledano does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    Toledano had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b), including the full range of sedentary work.

6.    Toledano is unable to perform any past relevant work (20 CFR 404.1565).

2

7.    Toledano was born in 1965 and was 46 years old at the time of the hearing, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    Toledano has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering Toledano's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Toledano can perform (20 CFR 404.1569 and 404.1569(a)).

11.    Toledano has not been under a disability, as defined by the Act, from December 1, 2011, through the date of the decision, July 3, 2014 (20 CFR 404.1520(g) and 416.920(g)). R. 16-23.

## ANALYSIS

a.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427

(1971).  Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

b.      **Testimony at the Hearing**.

At the time of hearing, Toledano was 48 years old.  R. 31.  He had completed the ninth grade.  R. 31.  He had no vocational training.  R. 35.

Toledano had worked as a flatbed driver of 18-wheelers hauling freight.  He was involved in the loading and unloading of the freight.  In the previous fifteen years he had done no other work.  R. 35.  He was not working at the time of hearing.  R. 31.

In 2011, he injured his right shoulder on the job.  He underwent surgery.  He felt it was about 80% healed.  He could not lift more than 50 pounds.  He did not have full rotation of the shoulder.  He was right handed.  R. 33.

Toledano also had a problem with his low back.  R. 33.  He went to a doctor for the problem around mid-2012.  R. 33.  He saw Dr. Domang, a pain management doctor.  R. 33.  He received epidural steroid injections, which helped "a little."  R. 33.  He underwent a rhizotomy which helped

for about five and a half months before the pain resumed.  R. 33.  At the time of the hearing, his treatment consisted of steroid injections, Lortab and Xanax.  R. 34 and 36.  The rhizotomy procedure cost a lot of money and he did not think it worked well.  The nerve grew back and was extra sensitive.  R. 36.

On a scale of 1 to 10, his back pain was a constant 7.  If he exerted himself, the pain level was a 10.  R. 34.  He had trouble sitting for extended periods.  R. 34.  He could not sit for more than 15 to 20 minutes before he had to change positions.  R. 34.  With the Lortab, he experienced dizziness and sometimes nausea.  R. 35.  During an average day, he sat around the house, he fed the animals, and he did light housework, including laundry, cleaning and occasional yard work.  R. 36.  His worker's compensation case was settled for $30,000.  R. 36.

Toledano was given additional time to submit the records of Dr. Robert Brinkman.  R. 30-31.

c.    **Medical Evidence**.

**2000-2009**

On September 21, 2000, Toledano was seen by Robert Brinkman, II, M.D., of the St. Tammany Physicians Network.  Because of a cholesterol screen, he was placed in a high risk category.  He was told to see a doctor.  Lab work was ordered.  R. 1402-05.

On May 20, 2002, Toledano returned to Dr. Brinkman with a complaint of a sore throat.  R. 1397-01 and 1406.

On March 19, 2003, Toledano was seen by Ms. Sigrid in Dr. Brinkman's office.  He was not in pain.  The assessment was carpal tunnel syndrome and paresthesia.  R. 1393-96

On April 27, 2004, Toledano was seen by Dr. Brinkman after a back injury.  He had fallen on an I-Beam.  R. 1387-92.  X-rays of the spine were normal.  R. 1429-30.  On September 29, 2004, he was seen by Dr. Brinkman for carpal tunnel syndrome.  R. 1382-86.

On December 4, 2005, Toledano was seen by Dr. Brinkman for a physical.  R. 1374-81.  On December 15, 2005, there was a stress test.  He tolerated it well.  There was no chest pain.  R. 1424-25.  There was an echocardiogram.  R. 1426-28.

On February 27, 2006, Toledano was seen by Dr. Brinkman for a follow-up concerning pain in the low back.  R. 1366-73.  There was lab work.  R. 1414-17.  On March 1, 2006, there was a CT scan of the abdomen and pelvis.  No significant abnormality was detected.  R. 1423.

On July 5, 2007, Toledano was seen by Dr. Brinkman for pink eye and a check-up.  R. 1361-65.  There was lab work.  R. 1353-60.  On October 15, 2007, he was seen by Dr. Brinkman for a follow-up with an abdominal ultrasound.  R. 1348-52.  There was lab work.  R. 1346-47.  The CT of the abdomen was unremarkable.  R. 1521.

On July 11, 2008, Toledano returned to Dr. Brinkman with elevated blood pressure.  R. 1341-45.  On July 21, 2008, he was seen by a gastroenterologist on a referral from Dr. Brinkman.  R. 1431.  On August 5, 2008, he underwent a colonoscopy which was normal.  R. 1498.  On August 18, 2008, he was seen by Dr. Brinkman for a follow-up on blood pressure.  He had no complaints of pain.  R. 1335-40.  On August 19, 2008, there was lab work.  R. 1332-34.  An October 3, 2008 an upper GI and small bowel X-ray series were normal.  R. 1419 and 1517.  An ultrasound of the abdomen revealed evidence of diffuse fatty infiltration of the liver.  R. 1420 and 1518.  An October 9, 2008 upper GI endoscopy was unremarkable.  R. 1421-22 and 1507-11.

### 2010

On January 19, 2010, Toledano was seen by Dr. Brinkman for a physical. He had no complaints of pain. R. 1327-32. On April 20, 2010, he was seen by Dr. Brinkman for a follow-up on hypertension. He had no complaints of pain. R. 1322. On May 1, 2010, there was lab work. R. 1313-21.

### 2011

On December 1, 2011, Toledano was seen by Dr. Brinkman for a check-up with complaints of no strength in his left arm, a knot on his left elbow and a sluggish feeling. He had no complaints of pain. R. 531-37 and 1306-12. He was to return in six months. R. 536. There was lab work. R. 332-36. On December 7, 2011, there was an ultrasound of Toledano's kidney. No echogenic calculus or hydronephrosis was appreciated. The view of the abdomen was normal. The tests were ordered by Dr. Brinkman. R. 330-31 and 1292-93.

On December 7, 2011, Toledano was seen by Dr. Mohammed Yousuf at Redi-Med Clinic and Occupational Health Center for an initial report of a work related injury on November 1, 2011. Dr. Yousuf indicated he was able to lift/carry 20 pounds and push/pull 20 pounds. The diagnosis was sprain in the right shoulder and tendonitis in the left elbow. He was referred to Kevin Darr, M.D., an orthopedist at Covington Orthopaedic & Sports Medicine Clinic, for an appointment on December 12, 2011. R. 1225. X-rays of the left shoulder revealed mild osteoarthritis and no acute bony process. X-rays of the left elbow were normal. The x-rays were ordered by Dr. Yousuf. R. 979-80.

On December 12, 2011, Toledano was seen by Dr. Darr for complaint of pain in the right shoulder and left elbow. The pain began in October 2011. He appeared calm and oriented to time, place and person. There was tenderness over the greater tuberosity and AC joint. There were

positive signs of impingement.  There was some weakness in resisted abduction and external rotation.  The examination of the left shoulder was negative.  There was tenderness over the lateral epicondyle and increased pain with resistance of the left wrist.  X-rays of the right shoulder revealed degenerative joint disease of the AC joint, type II acromion, and sclerosis over the greater tuberosity.  The assessment was right shoulder probable rotator cuff tear, bursitis, synovitis, impingement syndrome of the AC joint, and labral tear.  There was a possible tear of the left elbow.  MRIs of the left elbow and right shoulder were ordered.  R. 275-76 and 630-631.  Physical therapy (three sessions per week for four weeks) was ordered.  R. 262.

The impressions from a December 15, 2011 MRI of the right shoulder were:  (1) localized signal representing a small infra-substance partial thickness tear; (2) suspected tendinopathy of the anterior supraspinatus tendon; (3) moderate bursitis; and (4) moderated marginal hypertrophy and spurring of the acromioclavicular joint with slight distortion of the underlying supraspinatus tendon.  R. 264, 974 and 1082.  The impressions from a December 15, 2011 MRI of the lateral left elbow were:  (1) severe tendinopathy of the common extensor tendon; and (2) mild tendinosis of the distal triceps tendon and biceps tendon insertions.  R. 265, 975 and 1083.

On December 16, 2011, Toledano returned to Dr. Darr, who agreed with the radiology interpretation.  He was scheduled for right shoulder arthroscopy, subacromial decompression, bursectomy, distal clavicle excision, labral repair, and possible rotator cuff repair.  Percocet was prescribed.  R. 273-74 and 634-35.  Post-surgery physical therapy was recommended.  R. 259-61.  On December 19, 2011, he was seen by Todd Currier, a physical therapist, on a referral from Dr. Darr.  R. 993-95 and 1006-09.  On December 28, 2011, he was given Lortab, Soma, Mobic, and Omeprazzole.  R. 272 and 636.

**2012**

On January 6, 2012, Toledano was seen by Dr. Darr for his right shoulder and left elbow. Dr. Darr indicated that Toledano could not return to work.  R. 284.  Toledano reported that he did not like Oxycodone.  Ultram and Voltaren Gel were prescribed.  R. 271, 277 and 637.

On January 16, 2012, Dr. Darr performed surgery on Toledano:  (1) right shoulder arthroscopy; (2) mini open rotator cuff repair; (3) subacromial decompression; (4) distal clavicle excision; (5) synovectomy, major; and (6) Platelet Rich Plasma ("PRP") injection to the left elbow. R. 247-48, 452-55 and 925-26.  On January 18, 2012, Dr. Darr recommended physical therapy in one week.  R. 270 and 638.  Other records relating to the procedure at Fairway Medical Center are at R. 456-502.

On January 25, 2012, Toledano was seen by Dr. Darr.  He was referred for physical therapy. Ambien, Voltaren Gel and cortisone cream were prescribed.  He was to return in one month.  R. 269 and 639.  At that visit he reported that he was no longer taking pain medication.  R. 278.  Dr. Darr indicated that Toledano could return to work on limited duty.  R. 282.  On January 25, 2012, he returned to the physical therapist on a referral from Dr. Darr after the surgery.  R. 1010-11.

On February 10, 2012, Toledano returned to Dr. Brinkman.  He was not feeling well since the surgery.  He had a head cold and body aches.  R. 552-57 and 1286-91.  He was to schedule a follow-up as needed.  R. 557.  There was lab work.  R. 326-29, 558-66 and 1277-85.

On February 17, 2012, the physical therapist reported that Toledano was progressing well with right shoulder range of motion.  R. 256-57, 990-91 and 1012-13.  On February 22, 2012, he was seen by Dr. Darr.  Additional physical therapy was recommended.  His work status was light duty.  He was given Percocet, Ultram and Ambien.  He was to return in one month.  R. 268, 281 and 640.

On March 1, 2012, there was lab work.  R. 322-25, 567-74 and 1269-76.  On March 5, 2012, Toledano was seen by Dr. Brinkman for a follow-up for bloodwork after having mumps. He reported ringing in his ears.  He did not report any pain.  R. 575-79 and 1264-68.  He was to return in six months.  R. 579.  There was lab work.  R. 567-74, 580 and 1263.

On March 19, 2012, the physical therapist reported that since the surgery, Toledano had attended 23 therapy sessions.  He continued to make progress.  R. 253-54, 987-88 and 1014-15. On March 21, 2012, he was seen by Dr. Darr who recommended physical therapy and range of motion exercise to the shoulder.  He believed it would be six to twelve months before he could return to work in a full duty capacity.  His work status was light duty for the right upper extremity. He was given Mobic, Prilosec, Percocet and Tranzgel.  He was to return in one month.  R. 266-67, 280 and 641-42.

On April 16, 2012, the physical therapist reported to Dr. Darr.  R. 1016-17.  On April 18, 2012, Toledano was seen by Dr. Darr for a follow-up.  R. 911-12.  An X-ray showed acromion type I and distal clavicle excision.  R. 221.  There was lab work.  R. 321 and 1262.

On May 18, 2012, the physical therapist reported that Toledano continued to make progress.  The question of continuation of physical therapy was left to the discretion of Dr. Darr. R. 235-36, 906-07 and 1018-19.  On May 18, 2012, Toledano was seen by Dr. Darr.  R. 233-34, 775-77 and 904-05.

On June 14, 2012, the physical therapist reported to Dr. Darr that from January 25, 2012 through June 14, 2012, Toledano attended 51 sessions with good results.  He continued to progress with right shoulder strength but deficits continued.  It was recommended that he continue therapy for another month.  R. 782-83, 898-01 and 1020-21.

On June 25, 2012, Toledano was seen by Dr. Darr.  R. 212-16, 765-74 and 887-93.  The physical exam was normal except for tenderness of acromioclavicular joint, tenderness of the supraspinatus and subdeltoid bursa and some limitation in the range of motion.  R. 214.  Medrol was prescribed.  R. 216.  Toledano was referred for additional physical therapy.  R. 1091.

On July 23, 2012, Toledano was seen by Dr. Darr for follow-up for pain in the shoulder, sprains and strains of the shoulder and upper arm, rotator cuff, tennis elbow, disorder of bursae and tendons in shoulder region, rotator cuff syndrome.  R. 206-10 and 877-83.  He reported that he was improving.  He reported joint pain.  R. 207.  The results of the physical examination were: (1) his general appearance was healthy and there was no acute distress; (2) he was oriented to time, place and person, his mood was normal, his affect was active and alert; (3) the cervical spine had an active range of motion with no muscle atrophy; (4) the shoulder inspection was normal except for tenderness of the trapezius, latissimus dorsal and levator scapulae muscles; (4) the neurological exam was normal; (5) neck motor strength was 5/5 at all levels C5-T1; (5) lumbar spine was normal; and (6) motor strength was 5/5 at L1, L5 and S1.  An x-ray of the right shoulder revealed sclerosis over the greater tuberosity.  A distal excision was noted.  R. 208-09 and 761-62.  Lipoderm patches were prescribed.  He was referred to one session of physical therapy.  R. 210-11 and 763-64.  Dr. Darr indicated that he could return to work on limited duty.  R. 230.

On August 27, 2012, Dr. Darr reported that the anticipated date of maximum medical improvement was January 2013.  If Toledano's employer would accept the functional capacity evaluation ("FCE") restrictions, Toledano could return to work before he reached maximum medical improvement.  R. 249.

On September 5, 2012, there was a functional capacity evaluation ("FCE").  The therapist, Paul Jones, concluded that Toledano would not be able to perform safely all of the duties outlined

in his job description.  He opined that Toledano may be able to perform tasks required for a light or sedentary position.  R. 802.

On September 7, 2012, Toledano was seen by Dr. Brinkman.  His chief complaint was elevated blood pressure.  He reported throbbing low back pain.  R. 582-87.  Medication was prescribed and x-rays were ordered.  R. 586-87.  The impression of the x-ray of the lumber was no displaced fracture or dislocation.  R. 588-89.  On September 11, 2012, Toledano returned to Dr. Brinkman complaining of sharp pain in his low back.  R. 590-95 and 1254-59.  Medication was prescribed.  An MRI was ordered.  He was to return in six months.  R. 594-95.  The impression from the MRI was:  (1) mild degenerative disc changes at L4/L5 and L5/S1 with mild inferior bilateral neural foraminal narrowing, and (2) no significant spinal canal narrowing was appreciated.  R. 596 and 1490.

On October 2, 2012, Toledano was seen by Chad Domangue, M.D. of the Neuroscience & Pain Institute.  R. 390-92 and 1153-55.  He referred Toledano to William Schroder, a chiropractor.  R. 1448.  He was seen by the chiropractor at least every three to five days from October 3 through November 28, 2012.  R. 1433-47.

On October 10, 2012, Toledano was seen by Dr. Domangue.  R. 380.  On October 16, 2012, he received a lumbar epidural steroid injection at the left paramedian L5-S1.  R. 380-86, 393-98 and R. 1156-58.

On October 29, 2012, Dr. Darr referred Toledano for physical therapy.  R. 205 and 226.  He was to return in one month.  R. 227-29 and 869-74.  Dr. Darr indicated that he could return to work on limited duty.  R. 227.

On October 31, 2012, Toledano was seen by Dr. Domangue for a follow-up visit.  R. 399-01 and 1159-61.

On November 5, 2012, Toledano was seen by Dr. Brinkman to discuss sleep apnea. He did not report any pain. R. 598-603 and R. 1246-1251. On November 12, 2012, Toledano underwent a screening polysomnogram. The screening concluded that the upper airway should be optimized. He was counseled on the possible risk of driving considering his medication. R. 619-25 and 1407-13.

On November 6, 2012, Toledano received a further epidural steroid injection. R. 311-18, 402-04 and 1162-64.

On November 7, 2012, Dr. Darr approved Toledano for a FCE once his blood pressure was under control. R. 678.

On November 14, 2012, Toledano was seen by Dr. Domangue for low back pain. R. 291-93. On November 20, 2012, there was an epidural injection. R. 294-300, 406-07 and 1165-67. On November 30, 2012, he went to Dr. Domangue's nurse for a prescription refill. R. 1168.

On December 14, 2012, Toledano was seen by Dr. Darr. Toledano reported he was not working, the previous physical therapy did not help, an injection provided temporary relief, he needed a renewal of his prescriptions, and he continued to experience a lot of pain in the right shoulder. R. 202-03 and 794-96.

On December 19, 2012, Toledano was seen by Dr. Domangue for a follow-up visit for lower back pain. Toledano reported that he got hardly any relief from the last injection. R. 408-10 and R. 1169-71.

## 2013

On January 2, 2013, Toledano was seen by Dr. Domangue. R. 373-75. On January 8, 2013, there was a lumbar medial branch block at the Pontchartrain Surgery Center. R. 376-79 and R. 411-13 and R. 1172-74. On January 15, 2013, he returned to Dr. Domangue. R. 366-368.

On January 21, 2013, Toledano was seen by Dr. Darr.  R. 224-25 and 791-93 and 855-56. Dr. Darr cleared Toledano to return to work with restricted use of his right shoulder.  R. 223.

On January 22, 2013, Toledano went to Dr. Domangue for a lumbar medial branch rhizotomy.  R. 369-72 and R. 414-16 and R. 1175-77.  On February 13, 2013, he was seen by Dr. Domangue for a follow-up visit for lower back pain.  R. 417-19 and R. 1178-80.

On January 25, 2013, Dr. Darr's request for insurance authorization to provide a PRP injection was denied.  R. 744.

On February 26, 2013, Toledano was seen by Dr. Domangue.  R. 359-61.  On March 5, 2013, he was seen by Dr. Domangue.  R. 362-65.  There was a lumbar medial branch block.  R. 362 and R. 420-23 and R. 1181-83.  On March 12, 2013, he was seen by Dr. Domangue.  R. 352-54.  On March 19, 2013, he went to Dr. Domangue for a lumbar medial branch rhizotomy.  R. 355-58 and R. 423-25 and R. 1184-86.  On April 9, 2013, he was seen by Dr. Domangue for a follow-up visit for pain in the right hip and lower back.  R. 426-28 and R. 1187-89.

On April 16, 2013, there was a FCE performed by Paul Jones of Jones Physical Therapy, LLC.  R. 504-529 and 803-827, 829-853.  The report concluded that Toledano could function on a full-time basis at the work demand level as follows:  (1) material handling – limited to medium job demand level; and (2) non-material handling – no limitations.  The guidelines did not meet full duty requirements.  He may be able to perform the tasks required for a light or sedentary position. R. 505 and 828.

On April 23, 2013, Toledano was seen by Dr. Domangue.  R. 345-47.  On April 30, 2013, he was given a sacroiliac joint injection.  R. 348-351 and R. 429-431 and R. 1190-92.

On May 6, 2013, Toledano was seen by Dr. Brinkman for a follow-up visit.  He had no complaints.  R. 604-609 and 1240-45.  Lab work was ordered.  R. 287-89, 608-618 and 1231-1239.  He was to return in six months.  R. 609.

On May 20, 2013, Dr. Darr indicated that Toledano had reached maximum medical improvement.  R. 222.

On May 31, 2013, Toledano was seen by Dr. Domangue for a follow-up visit for pain in the lower back and sciatic pain on the right.  R. 432-33 and R. 1193-95.  On July 17, 2013, Toledano was seen by Dr. Domangue.  R. 338-340.  It was noted that he had excellent results from a medial branch block.  R. 338.  On July 23, 2013, he returned to Dr. Domangue.  R. 341-344.  There was a lumbar medial branch rhizotomy.  R. 341 and R. 435-37 and R. 1196-1198.

On October 3, 2013, Toledano was seen by Felix G. Rabito, Sr., M.D., F.A.C.P., for a consultative examination.  R. 443-446.  There was an x-ray of the right shoulder and Dr. Rabito concluded the right shoulder appeared normal.  R. 446.

**2014**

On April 8, 2014, Toledano went to Dr. Brinkman with a report of low back pain.  He wanted an injection and pain medication.  An injection was given.  R. 1543-48.

**d.**     **Plaintiff's Appeal**.

**Issue No. 1**.     Is there substantial evidence to support the ALJ's decision that Toledano was capable of the full range of light work.

The ALJ found that Toledano had the residual functional capacity ("RFC") to perform the full range of light work, including the full range of sedentary work.  R. 18.  Toledano urges that the ALJ did not determine whether there was an erosion of the sedentary and light duty jobs identified by the ALJ because of the issues with his right shoulder.  He contends that the ALJ's RFC determination is not supported by substantial evidence.  Rec. doc. 15 (Memorandum at 7-8).

On December 7, 2011, Dr. Yousuf at Redi-Med Clinic indicated that Toledano was able to lift or carry twenty pounds and push or pull twenty pounds.  R. 1225.

When Dr. Darr examined Toledano two days after the shoulder surgery on January 18, 2012, the surgical wound was healing nicely, and he had no swelling or tenderness and 150-degree range of motion.  R. 270.

The office notes for Dr. Darr for February 22, 2012 include a recommendation of physical therapy with range of motion exercise to the right shoulder three times a week for four weeks.  Dr. Darr stated, "[w]ork status is light duty."  R. 268.

Todd Currie, a physical therapist, noted in a March 19, 2012 report to Dr. Darr that Toledano had 4+/5 or 4/5 muscle strength in the right shoulder.  R. 253.  The report states:

> The patient notes significant improvement with treatment rated at 30-40% overall. He does note increased instances of pain since increased intensity of treatment.  He rated pain today at 6/10.  Patient reports that the shoulder continues to improve.  He reports overall improvement rated at 60-70%.  He states that the shoulder has been sore the past few days after mowing the lawn.

R. 253.

On January 21, 2013, Dr. Darr cleared Toledano to return to work with restricted use of his right shoulder.  R. 223.

Paul Jones, a physical therapist, prepared a FCE Report prepared for Dr. Darr, dated April 16, 2013.  R. 504-29.  For the aerobic capacity test Toledano's subjective report of pain was consistent with test behavior.  R. 510.  However, for the Safe Maximum/Occasional Lifting and Carrying Test and the Functional Activity Circuits, Toledano's subjective report of pain was high compared with test behavior.  R. 513 and 515.  The FCE report reflects that Toledano was able to squat, bend, kneel, crawl, reach overhead, and climb, all without assistance.  R. 517.

On May 9, 2013, Therapist Jones reported that while Toledano would be unable to safely perform all of the duties outlined in his job description, he might be able to perform the tasks required for a light or sedentary position.  R. 802.

In his October 3, 2013 report of his September 26, 2013 examination of Toledano, Dr. Rabito stated:

> On physical examination the applicant appeared to be a robust appearing male in no acute distress. . . .  He demonstrated discomfort, some decreased range of motion and some lack of strength in the upper right extremity.  Range of motion in all planes in the lower back was normal.  There were no reflex or neurologic deficits evident and the applicant was able to heel and toe walk with good balance and no evidence of a foot drop.  More information is needed regarding his current clinical status and his functional capacity evaluation.  He presently appeared to be stable and capable of normal ambulatory activities, which does not require strenuous and repetitive use of his right upper extremity and lower back.  His mood and affect was appropriate and he presented with no other significant medical problems at this time.

R. 445.  Dr. Rabito ordered an x-ray exam of the right shoulder.  The impression of the September 26, 2013 x-ray was "[n]ormal right shoulder."  R. 446.

At the April 15, 2014 hearing, Toledano testified that he could lift up to 50 pounds.  R. 32.[1] A person is only required to lift 20 pounds for light work.  20 CFR 404.1567(b).

Jennifer Toledano, plaintiff's wife, submitted a function report.  She reported that her husband:  (1) bathed, watched TV and did light chores from the time he woke up until he went to bed; (2) his activities included preparation of lights meals and household chores; (3) his outdoor chores including using a riding lawn mower; (4) when he went outside he traveled by car and by motorbike; and (5) he went to church services and a ballpark, where he watched his son practice.

---

[1]  A claimant's own testimony may support an ALJ's RFC assessment.  "Watson's own testimony indicated that he could lift up to 50 pounds. . . .  Thus, there was substantial evidence to support the ALJ's finding that Watson could perform medium work."  Watson v. Barnhart, 288 F.3d 212, 216 (5th Cir. 2002).

R. 146-153.  In April 2014, Toledano reported to Dr. Darr that he had moved a washer and dryer over the weekend.  R. 1546.  The ALJ considered Toledano's daily activities.  R. 21.[2]

Toledano implies that he has no use of his right upper extremity (Rec. doc. 15 (Memorandum at 7), but cites no evidence to support the claim.  As described above there is substantial evidence to support the ALJ's decision that Toledano was capable of the full range of light work.

**Issue No. 2**.    Did the ALJ err in failing to ask questions of a vocational expert who was present at the hearing?

The ALJ, based on the RFC and considering Toledano's age, education and work experience, determined that a finding of "not disabled" was directed by Medical-Vocational Rule 202.18.  Crystal Younger, a vocational expert, was present at the hearing, but no questions were asked of her.  R. 14.  The only testimony at the hearing was that of Toledano.  R 30-37.

Toledano contends that where nonexertional limitations are involved, testimony from a vocational expert is required.  In Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit stated:

> If impairments are solely exertional or the nonexertional impairments do not sufficiently affect the claimant's residual functional capacity, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform.  If, however, the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that such jobs exist in the economy.

---

[2]  Toledano argues that the performance of household chores is not particularly probative of ability to perform substantial gainful activity.  Rec. doc. 15 (Memorandum at 8).  In Leggett v. Chater, 67 F.3d 558, 565, n.12 (5th Cir. 1995), the Fifth Circuit stated, "[i]t is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status."  Id. (citing Reyes v. Sullivan, 915 F.2d 151, 155 (5th Cir.1990) (per curiam)).  In Owens v. Heckler, 770 F.2d 1276, 1282 (5th Cir. 1985), the Fifth Circuit found that the ALJ's conclusion that the plaintiff was not disabled, but able to perform light work was supported by substantial evidence, including evidence of his daily activities (attending church, doing light yard work, going to the grocery store and caring for his personal needs).

Id. at 458 (citations omitted).  See also Watson v. Barnhart, 288 F.3d 212, 216 (5th Cir. 2002).

Toledano urges that he suffered from significant nonexertional impairments including pain, weakness, and limitation of motion and lack of full use of the right extremity.  The Commissioner responds that the ALJ found that Toledano retained the RFC for the full range of light work.  As demonstrated above, there is substantial evidence for this finding.  The ALJ did not find any significant non-exertional impairments.  The ALJ could rely exclusively on the grid rules.  The ALJ was not required to rely on a vocational expert to establish that jobs existed in the economy.

**Issue No. 3**.   Did the ALJ give proper weight to the finding of the Functional Capacity Evaluation performed by Jones Physical Therapy?

Toledano participated in an FCE on September 5, 2012 and on April 16, 2013 by Paul Jones, a physical therapist.  The therapist noted that Toledano had:  (1) decreased range of motion in the right shoulder in abduction/elevation and internal rotation; (2) weakness in all planes and right grip strength; (3) his right shoulder strength was 62% of his left; (4) difficulty in reaching and lifting overhead; (5) pain with repetitive movement and while resting at night; (6) material handling capabilities were limited to:  light to medium activities with occasional lifting not to exceed 50 pounds; and (7) there were no restrictions in nonmaterial handling capabilities such as sitting, standing and writing.  The therapist concluded that he might be able to perform the tasks required for a light or sedentary position.  R. 802.  The report by Therapist Jones supports the ALJ's finding that Toledano had the RFC to perform the full range of light work.

On October 9, 2013, Michael Coogan, M.D., signed the Disability Determination Explanation.  R. 50 and 51.  Dr. Coogan assessed Toledano as possessing the capability to perform work at the light exertional level.  R. 50-51.  The ALJ gave significant weight to this analysis.  R. 22.  The ALJ also found the consultative examination report of October 3, 2013 by Dr. Rabito to be highly probative.  R. 22.  The FCE report by Therapist Jones was not itemized as initial evidence

of record at the time of Dr. Coogan's DDS determination.  R. 42-44.  Nor was it available to Dr.

Rabito.

After describing the weight given to the reports by Dr. Rabito and Dr. Coogan, the ALJ

stated:

> The undersigned does not adopt the additional restrictions, based on the functional
> capacity assessment by Jones Physical Therapy, which was not available to either
> Dr. Rabito or Dr. Coogan at the time of their assessment.  These physicians also
> did not have access to the later medical record and other records, which indicate
> that the claimant engages in significant physical activity. . . .

R. 22.

Toledano reads this statement by the ALJ as:

> [The FCE] provided significant information regarding Mr. Toledano's restrictions.
> The ALJ refused to consider this important evidence on the grounds that it had not
> been reviewed by Dr. Rabito or Dr. Coogan.  This is not a proper reason for
> disregarding this important evidence.

Rec. doc. 15 (Memorandum at 8).  The Commissioner, however, states:

> This is a misreading of the ALJ's decision.  The ALJ actually stated the opposite –
> he did not accept some restrictions from Dr. Rabito and Dr. Coogan because they
> did not have access to Mr. Jones' physical therapy evaluation.

Rec. doc. 18 (Memorandum at 10).  The Court agrees with the Commissioner's reading of the

ALJ's statement.  As the Commissioner notes, the assessment by Therapist Jones supports rather

than detracts from the ALJ's RFC assessment for light work.  Therapist Jones reported that while

Toledano would be unable to safely perform all of the duties outlined in his job description, he

may be able to perform the tasks required for a light or sedentary position.  R. 802.

**Issue No. 4**.     Did the ALJ fail to consider and list the six specific considerations required before deciding not to give controlling weight to the opinion of a treating physician?

Toledano contends that the ALJ disregarded the disability opinions of Dr. Darr, the treating orthopedist.   After making this statement, Toledano's memorandum for nearly three pages describes the law and regulations regarding the deference accorded the opinions of treating physicians.  Rec. doc. 15 (Memorandum at 9-12).  Nowhere does Toledano state the opinions that were disregarded.  He concludes his argument on this issue with the statement that, "[t]he ALJ failed to provide the required rationale for discounting Dr. Henderson's opinions.  This error requires remand."  Id. at 12.[3]

The ALJ described the treatment that Toledano received from his orthopedist, Dr. Darr, as including:  (1) his examination on December 12, 2011; (2) his right shoulder arthroscopy on January 16, 2012; (3) his post-operative treatment; (4) a March 21, 2012 report indicating that it would be a total of 6 to 12 months for Toledano's return to work in full duty capacity; and (5) a May 20, 2013 finding that he had reached maximum medical improvement.  R. 19.  Dr. Darr cleared Toledano for limited work duty in March 2012 (R. 267 and 280), October 2012 (R. 227) and January 2013 (R. 223).

There is no evidence that Dr. Darr ever opined that Toledano was disabled.  There is no statement in the ALJ's decision that he discounted or rejected Dr. Darr's opinions.  His opinions are consistent with the ALJ's finding that Toledano had the RFC to perform the full range of light work.

**Issue No. 5**.     Did the ALJ err in failing to award benefits for a closed period from December 1, 2011 to May 20, 2013?

---

[3] The reference to Dr. Henderson is an error.  There is no evidence that Toledano ever saw a Dr. Henderson.

In the alternative, Toledano argues that the ALJ should have found a closed period of disability because: (1) he was first seen by Dr. Darr on December 12, 2011 (R. 275); (2) Dr. Darr's office notes for March 21, 2012 state, "I feel it would be a total of 6 to 12 months for return to work in a full duty capacity" (R. 267); (3) Dr. Darr indicated that Toledano reached maximum medical improvement on May 20, 2013 (R. 222); and (4) therefore a closed period of disability was required for December 1, 2011 to May 20, 2013.  Rec. doc. 15 (Memorandum at 13).

The Social Security Act defines disability as the inability to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A).  As described above, Dr. Darr cleared Toledano for limited work duty in March 2012, October 2012, and January 2013.  R. 223, 227, 267 and 280.  Dr. Darr released Toledano to return to work with limited use of his right shoulder in January 2013.  R. 267.  The record does not support any 12-month period of disability as defined by the SSA.


## <u>RECOMMENDATION</u>

Accordingly, IT IS RECOMMENDED that:  (1) the cross-motion of the defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, for summary judgment (Rec. doc. 18) be GRANTED; and (2) the motion of the plaintiff, Charles P. Toledano, for summary judgment (Rec. doc. 15) be DENIED.


## <u>OBJECTIONS</u>

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 18th day of July, 2016.

**SALLY SHUSHAN**
**U.S. Magistrate Judge**